## CHARLESTON

HALL *et als* v. SOUTH PENN OIL CO.

Submitted June 6, 1910. Decided October 8, 1910.

1.  MINES AND MINERALS—*Oil Lease—Cancellation*

Mere violation of an implied covenant in an oil and gas lease, under which the right to produce has vested by the completion of a productive initial or experimental well, to fully operate the premises for the mutual benefit of the parties thereto, affords no ground for either complete or partial cancellation of the lease. (p. 84).

2.  CANCELLATION OF INSTRUMENTS—*Oil Lease—Partial Cancellation —Pleading.*

If there is a right of partial cancellation of such a lease for failure to drill additional wells, to prevent loss by drainage of oil or gas from the leased premises through wells of the lessee on adjacent land, the allegations of the bill, to make it good on demurrer, must state facts showing, with reasonable certainty, such drainage in substantial quantities, and, according to some authorities, with fraudulent intent on the part of the lessee. (p. 85).

Appeal from Circuit Court, Lewis County.

Bill by William H. Hall and others against the South Penn Oil Company and another. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

*Robt. L. Bland,* for appellants.

*A. B. Fleming* and *C. Powell, W. W. Brannon, Kemble White* and *E. A. Brannon,* for appellees.

POFFENBARGER, JUDGE:

This appeal questions the correctness of a decree, dismissing, on demurrer, the bill of Wm. H. Hall and his wife and Louis C. Woofter against the South Penn Oil Company and F. H. Faupel, filed for partial cancellation of an oil and gas lease, held by the defendant on land, which Hall had owned, at the date of the execution of the lease, but had conveyed, in nearly equal parts, to Faupel and Wm. J. Woofter, grantor of Louis C. Woofter, reserving in each instance one-half of the one-eighth oil royalty and one-half of the cash gas royalty, provided by the lease.

The tract of land on which Hall gave the lease, while he owned it, contained 400 acres, 192.55 acres of which he conveyed to Faupel and the residue to Woofter. Before these conveyances were made, the lessee drilled three producing wells, all situated near each other, on the part conveyed to Faupel, but none on the part conveyed to Woofter, and has failed and refused to drill any additional wells on any of the land, although requested to do so. Further allegations of the bill are that the drilling of the three wells did not sufficiently test the entire tract for oil and gas; none of the wells has been caused "to produce its proper capacity of oil," nor "properly protected or cared for"; the lessee has developed contiguous property and thereby "materially prejudiced the oil and gas" in the leasehold property and "drained the same therefrom" and is now doing so; the lines of the leasehold have not been properly protected; the tract has not been developed as was contemplated by the parties, nor made mutually profitable, though located in a defined oil field; nothing has been done on the Woofter portion of the land, though it is in a defined oil and gas field and, if developed, would produce both oil and gas.

Charging refusal to drill additional wells, under these conditions, to be a violation of an implied covenant of the lease and ground or cause of forfeiture, the bill seeks cancellation of the lease as to the Woofter portion of the 400 acre tract.

Courts everywhere recognize an implied covenant on the part of the lessee in oil and gas leases, to operate the mines or leased property for the mutual benefit of both parties thereto. This covenant imposes a duty to drill as many wells on the property as are necessary to obtain therefrom all the oil and gas that it is reasonably and fairly profitable to extract and market. This covenant seems, however, not to be absolute, but subject to the right of the lessee at any time to wholly cease operations and abandon the property, in the absence of an express covenant to operate. In other words, he has an option cr privilege to exhaust the mineral resources of the property, and may at any time give up his lease, without liability, but must operate it in a skilful, diligent and just manner as long as he continues to occupy it.

The number and location of wells, requisite to the performance of this covenant, depend upon the character of the leased territory. The area of the lease does not determine the number, nor is their relation to one another governed by any fixed rule. Whether, after the discovery of oil or gas, by means of the initial or experimental well, there is a duty to sink additional wells, depends upon the probability, arising from the circumstances surrounding the property, that an additional well or wells will be profitable to the lessee. He is under no duty to operate at a loss to himself to make the premises profitable to his lessor. It is only under circumstances indicative of mutual profit,—profit to lessee as well as lessor,—that the duty to operate devolves.

The consequences of violation of this covenant vary with the character of the violation. Failure to operate at all or abandonment of the lease, in the absence of an express covenant to operate, terminates the lease, or confers upon the lessor the right to terminate it, under the principle of surrender. Failure or refusal, while occupying the lease and operating it, to drill additional wells, under circumstances imposing a duty to do so, makes the lessee liable in damages to the lessor, for which the remedy at law is held to be an adequate one by courts in all jurisdictions, and affords no ground for either partial or total cancellation or rescission, and this rule has been repeatedly asserted by this Court. *Ammons* v. *South Penn Oil Co.*, 47 W. Va. 610;

*Harness* v. *Eastern Oil Co.,* 49 W. Va. 232; *McGraw Oil Co.* v. *Kennedy,* 65 W. Va. 595; *Core* v. *Petroleum Co.,* 52 W. Va. 276. In so far as this bill seeks cancellation for mere failure to drill additional wells, or to compel the drilling thereof, it is, therefore, clearly bad and insufficient on demurrer.

The bill, however, adds to the allegation of violation of the implied covenant the circumstance of drainage of the territory by the defendant through other wells drilled upon adjacent territory. As to whether this circumstance, sufficiently pleaded and proven, affords ground for equitable relief by partial cancellation, there is some conflict of authority. It is affirmed by *Kleppner* v. *Lemon,* 176 Pa. St. 502, and admitted by *Colgan* v. *Oil Co.,* 194 Pa. St. 243, and *Young* v. *Oil Co.,* 194 Pa. St. 243, when the circumstances are such as to amount to fraud on the part of the lessee. *Harris* v. *Oil Co.,* 57 O. St. 118, *Kellar* v. *Craig,* 126 Fed. 630, *Ammons* v. *South Penn Oil* Co., 47 W. Va. 610, and *Harness* v. *Eastern Oil Co.,* 49 W. Va. 232, seem to oppose this doctrine; but none of them involved facts, indicative of as much intent on the part of the lessee to defraud the lessor as those disclosed in the *Kleppner Case.* In the *Harris Case,* it appeared that a number of wells had been drilled on the leased premises and most of them along the lines thereof, four along the west line, one 200 feet from the south line, and one about 200 feet west of the center of the farm. In the *Ammons Case* a number of wells had been drilled on the leased premises and large quantities of oil were produced. In the *Harness Case,* a number of wells had been drilled, several of which were offsets to wells on adjacent lands. They did not present the extreme hardship of the *Kleppner Case* in which only one well had been drilled on the premises, while others drilled on adjacent lands by the lessee were undoubtedly draining the oil from the Kleppner land. Such aggravated cases do not often arise. Ordinarily, the royalties paid to the lessors of adjacent lands by the common lessee are the same and, to fully operate the territory, it is necessary to drill wells close enough together to off-set one another along the lines. Under such conditions there is usually no motive on the part of the common lessee to locate the wells in such manner as to prejudice either of the lessors. The peculiarities of the Kleppner land happened to

furnish a motive, it being a small triangular tract, the rock of which was harder than that of the adjacent lands. Neither our cases nor the Pennsylvania cases seem to lay down an inflexible rule on the subject. Thus *Core* v. *Petroleum Co.* says "Ordinarily, a breach of an implied covenant will not work a forfeiture of the lease." Many of the applications for equitable relief against violation of the implied covenant have had for their purpose cancellation for mere violation of the covenant rather than for loss of oil and gas by drainage, and the allegations as to drainage have been pretentious rather than real.

Such is the character of this bill. Its allegations lack the certainty and definiteness requisite to a bill invoking the application of the principle of the *Kleppner Case*. The charges as to drainage and fraud are mere conclusions. How far distant the wells on contiguous property are is not disclosed nor is the production of any of them given. Owing to the fugitive character of oil and gas, it is impossible to know at what distance drainage takes place, and it is known that it depends somewhat upon the character of the sand. Whether a well 500 feet or 1000 feet distant would drain oil or gas from an adjacent tract is largely a matter of conjecture and surmise, and, for all that appears here, the wells on the contiguous property may be that far or farther from the leased premises. Not a word in the bill shows or indicates where they are. The *Kleppner Case*, as interpreted by the later Pennsylvania cases, requires a state of facts giving rise to an inference of actual fraud on the part of the lessee as the basis of equitable jurisdiction and equitable relief, and an allegation as to fraud is wholly insufficient unless it states facts which, if true, prove the fraudulent intent. Tested by this principle, these allegations are wholly insufficient. The facts and circumstances actually existing, may be sufficient to make out a case of fraud, but if so, they are not stated in the bill, beyond which the court cannot go in the present state of the case.

If relief in equity could stand upon the theory of a partial failure of consideration for the lease, the bill would still be insufficient for the reason that the facts stated do not show such failure. From common knowledge of the character of oil and gas, it may be said that drainage, in a narrow and limited sense,

may be effected by distant wells, but certainly not sufficiently to amount to a substantial failure of consideration. Hence, to make out such a case, it would be necessary to show wells in close proximity to the lease premises and producing substantial quantities of oil or gas.

In no jurisdiction, so far as we have observed, is a covenant to save all the oil and gas, or either, raised by implication. A requisite thereto is the existence of oil or gas at the point in question, sufficient in quantity to repay the cost of production and a profit to the lessee. No prudent man would either expressly or impliedly undertake to get it all out regardless of cost or profit. Necessarily there will be some waste or loss as in the case of mining coal or harvesting grain. Obviously there can be no implied covenant against the allowance of any drainage at all, however slight. Hence, if a sufficient allegation of actual fraud could be dispensed with, it would still be necessary to show drainage in a substantial sense in order to make a good bill for cancellation.

In response to a demand for the drilling of additional wells, the lessee replied "If Mr. Hall has any one who is ready to drill, we will be glad to release part of the property. I trust this will be satisfactory." This is relied upon as showing good faith on the part of the lessee, but a majority of the Court are of the opinion that this circumstance would be entitled to no weight, if the bill showed drainage, as in the *Kleppner Case,* and we regarded the doctrine of that case as sound.

For the reasons here stated, we affirm the decree.

*Affirmed.*